LEIGH M. CLARK, Retired Circuit Judge.
A jury found this appellant guilty of robbery in the first degree as charged in an indictment that alleged in pertinent part the following:
“DAVID MATTHEW THOMAS, alias LARRY WELLS, ... did, in the course of committing a theft of Eighty Dollars and No Cents ... the property of Denise Lynn Daniel, use force against the person of Denise Lynn Daniel, or against the person of another person, with intent to overcome her physical resistance or physical power of resistance, while the said DAVID MATTHEW THOMAS, alias LARRY WELLS, was armed with a deadly weapon or dangerous instrument, to-wit: a knife in violation of Section 13A-8-41 of the Alabama Criminal Code.”
The court sentenced him to imprisonment for life and thereafter denied defendant’s motion for a new trial.
The only eyewitness who testified as to the actual robbery was the victim, who testified that she was employed as a secretary for the Development Office of the University of Alabama in Birmingham on the date of the alleged incident. The attorney representing appellant is the same attorney who represented him on the trial of the case and correctly recites a pertinent part of the testimony of Denise Lynn Daniel as follows:
“Mrs. Daniel testified that on August 1, 1983, she drove her 1973 green Maverick automobile to the fourth level of the parking deck of the Community Health Building located at 933 South 19th Street and parked. The witness further related that as she was getting out of her car a young black male ordered her into the car. As he got into the car with her, she stated, he had a knife. (R. 7). Mrs. Daniel went on to relate the story of how the assailant robbed her and was scared away when some other persons drove into the parking deck. The witness then identified the defendant, David Matthew Thomas, as her assailant. (R. 12).”
We now quote from some of the pertinent parts of the testimony of Denise Lynn Daniel as follows:
“Q. And did you go on a particular floor of the building?
“A. I drove up to the fourth level of the parking deck.
“Q. And did you get out of your car at some point?
“A. Uh-huh.
“Q. And as you got out of your car did something happen at that point?
“A. Yes. After I parked I opened my door and I had my package and my purse and I got out of my car and I looked up and I saw a young black male coming down, there is a little stairwell that comes down from the fifth level to the fourth level. Okay. I had not at that time, I don’t think, closed the door to my car yet. I looked at him, he looked at me and I looked away.
“Q. Was he alone or with someone else?
“A. He was alone. And, so, I was going to close my car door and he was going to, you know, go past me. I didn’t think anything about it. So, the next thing I felt, I believe, it was his left hand over my mouth. And I believe it was his right hand at my stomach with a knife.
“Q. Were you at your car at this point?
“A. Yes, I was standing beside the car.
“Q. Were your car doors still open?
“A. I think it was still open. I don’t remember, but I think so.
“Q. Did you have the package in your hand and your purse?
*842 “A. Uh-huh. Package and purse in my hand.
“Q. And you felt this arm or hand?
“A. Hand at my mouth.
“Q. And did you notice anything else at that particular point?
“A. Well, he had a knife at my stomach.
“Q. Did you see the knife or did you feel it?
“A. No, I could not feel it but I sort of — I knew it was there, I sort of caught a glimpse of it. I didn’t look directly at it.
“Q. Could you describe the knife for us, please?
“A. I don’t believe — I’m not sure if it was a switchblade knife.
“Q. But you did see the knife?
“A. Yes.
“Q. And after you grabbed and felt the knife, would you tell the ladies and gentlemen what was said or done at that particular point?
“A. Okay. He said, while he was holding me, the knife in his hand over my mouth, he said ‘give me all your money and I won’t hurt you.’
[[Image here]]
“Q. Did he stay outside the car or get in the car?
“A. At this point he was still outside the car and he said — as he said give me your money, I was in my purse, I opened my purse and I opened my billfold.
“Q. How much money did you have on that occasion?
“A. It was approximately Eighty Dollars ($80.00).
“Q. Was this U.S. currency?
“A. Uh-huh. So I opened my billfold and I just took my money out of my billfold and I said ‘Here.’ And he took the money and he said ‘Is that all you have got?’
[[Image here]]
“A. Okay. He got in the car also. And he, I know at this point, he had the knife at my throat.
“Q. You felt the knife at your throat—
“A. Yes.
[[Image here]]
“Q. And did you have some injuries around about your neck area?
“A. There was a teeny, tiny little cut just showing where it had been held against my throat.
“Q. While he was in the car and while the knife was at your neck, what if anything happened at that point?
“A. Okay. I was screaming and crying for help, saying ‘please don’t hurt me.’
“Q. What happened after that?
“A. Okay. At that point someone drove up in the parking deck. And, of course, you could hear them driving up. And someone — anyway, I turned around and saw them, so I screamed even more. They stopped, they saw what was going on.
“Q. Where was the knife when they stopped?
“A. At my throat. And one of the ladies that was driving one of the cars that drove up in the deck, she blew her horn. Okay. He ran then, he saw that someone had seen him. So, he just took off running.
[[Image here]]
“Q. In which direction did he run, Ms. Daniel?
“A. Well, he ran — we were up on the fourth level, so he ran down all the levels of the parking deck.
[[Image here]]
“Q. What happened then, Ms. Daniel?
“A. Well, then someone went and called the police.
“Q. And sometime later on that afternoon were you taken to the emergency room?
“A. Yes. They gave me a tetanus shot for the cuts I had sustained on my hands.”
We now quote from the testimony of the witness on cross-examination:
“Q. You said you weren’t sure what kind of knife it was.
“A. That is correct.
“Q. It was a short bladed knife; wasn’t it?
*843 “A. Yes.
[[Image here]]
“Q. Do you recall whether or not the individual took the item in his hand from you when he was outside the car? What did he take from you actually in his hand?
“A. Okay. I handed him the Eighty Dollars ($80.00) so he had it in his hand.
“Q. He didn’t take the purse?
“A. No. I took the billfold out and took the money out of my billfold and handed it to him.
“Q. He was holding you at that time?
“A. Well, like I testified, I don’t think he was physically holding me at that time.
“Q. He was not physically holding you?
“A. But the threat of the knife was there.
“Q. Well, I didn’t ask that. Did you see the knife at that time when you handed it to him?
“A. I was not looking at it, no, sir.
“Q. You were looking for help at the time you were handing it to him; weren’t you?
“A. I was so terrified that all I was intent on doing was handing him my money.”
Except for some of the testimony of the only eyewitness on the trial as to the alleged robbery that we may hereafter quote as applicable to one or more of the three issues presented in brief of counsel for appellant, we believe we have set forth enough of her testimony before commencing our discussion of such issues.
I.
By appellant’s first issue, the contention is made that it constituted reversible error for the trial court to “allow the in-court identification of the appellant by the victim into evidence over objection that said identification was prejudiced by a pre-indictment lineup conducted in violation of appellant’s Sixth Amendment and Fourteenth Amendment right to counsel.” It is regrettable that we must state that appellant’s first issue is either not correct or is not understandable by us, as the court reporter’s transcript of the evidence discloses that “the in-court identification of the appellant by the victim” was introduced in evidence on direct examination by the State without any objection whatever on behalf of defendant, as shown by the following at pages 11 and 12 of the record during the direct examination of the witness:
“Q. Is the person you have just described as doing and saying these things to you, do you see him in the courtroom today?
“A. Yes, Ido.
“Q. Would you point him out for the jury and describe how he is dressed?
"A. Okay. He is sitting right there dressed in a green uniform.
“MS. BARCLAY [assistant district attorney]: Let the record reflect that the witness indicated the defendant in this case, David Matthew Thomas.”
In response to appellant’s first issue, counsel for appellee states in part the following:
“[T]he State would point out that at the time Ms. Daniel’s in-court identification was made, Appellant placed no objection. (R. 12). It was not until the conclusion of Officer Strunk’s testimony that the motion was made to exclude the identification. (R. 92). By this time, the testimony was already before the jury without objection and thus Appellant’s objections were not timely made in order to preserve this issue for review. Yates v. State, 390 So.2d 32 (Ala.Crim.App.1980). It would appear that a suppression hearing, outside the hearing of the jury, should have been held to determine whether or not to admit the in-court identification at trial. Appellant, however, did not proceed in this manner and thus did not preserve the issue for appeal. E.g., Fitchard v. State, [424 So.2d 674 (Ala.Cr.App.1982) ].”
Although counsel for appellee proceeds to challenge counsel for appellant as to the first issue as if there had been an objection by appellant’s attorney to the in- *844 court identification, we see no necessity for passing on the academic issue presented by the further discussion of counsel for appel-lee; and we determine on the basis of what we have already said that the first issue presented by appellant is not well taken.
II.
The second issue presented by appellant is captioned in the brief of his counsel as follows:
“WHETHER IT WAS REVERSIBLE ERROR FOR THE TRIAL JUDGE TO ALLOW THE IN-COURT IDENTIFICATION OF THE APPELLANT BY VICTIM DENISE LYNN DANIEL INTO EVIDENCE OVER OBJECTION THAT THE SAID IDENTIFICATION WAS PREJUDICED BY THE SUGGESTIVE NATURE OF A PREINDICTMENT LINEUP CONDUCTED IN VIOLATION OF APPELLANT’S FIFTH AMENDMENT RIGHT TO DUE PROCESS.”
Immediately after the captioned second issue we have just quoted, the brief of counsel for appellant contains the following:
“At the close of the State’s case appellant moved for the in-court identification of the appellant by the victim Mrs. Daniel [to] be excluded dur to its tainting by the suggestiveness of a pretrial lineup in violation of his Fifth and Fourteenth Amendment right to due process. (R. 136).”
It is to be observed that the ruling of the trial court to which the issue is directed was neither invoked nor made until a considerable period of time had intervened between the admission of the evidence of the identification of the defendant by the victim, which is made clear by the following statement of defendant’s attorney:
“First of all, we would like to renew our Motion to Suppress the in-court identification made by Mrs. Daniel on the same ground previously stated. And we would also include as part of those grounds the prejudicial effect of having viewed the photographs prior to the lineup. And that the defendant’s picture was the only picture in the photographs who was also in the line-up.
“I believe the prejudicial effect of that would cause her to identify the person in the line-up and later to again taint her identification in the courtroom.”
The court reporter’s transcript shows that Lt. Daniel M. Strunk of the University of Alabama Police Department in Birmingham, “the primary investigating officer on this particular incident,” showed the victim some photographs of persons to see if she could identify any of them as the person who robbed her. We quote from part of his testimony on cross-examination:
“Q. So there were three opportunities then to view the photographs?
“A. There were three opportunities to view photographs.
“Q. Okay.
“A. One of which Mr. Thomas was only in.
“Q. And that was in the first set?
“A. He was not in the first set.
“Q. Second set?
“A. He was in the second set.
“Q. And back to the first set, on the day of the incident, you made no positive identification of anyone in that set?
“A. No, sir.
“Q. Regarding the second set, she made no positive identification of anyone in that set?
“A. No positive identification.
“Q. Regarding the third set, she made no positive identification of anyone in that set?
“A. No positive identification.
“Q. And the line-up occurred approximately eleven days after the event?
“A. First to the twelfth, would be approximately eleven days.”
On redirect examination, the witness testified in pertinent part as follows:
“Q. If I understand you correctly, the day that Mrs. Daniel was attacked—
“A. Yes, sir.
“Q. —And was brought to the hospital, you brought her a set of pictures that didn’t have his picture in it?
*845 “A. That is correct.
[[Image here]]
“Q. So she didn’t pick any out; did she?
“A. No, sir.
“Q. And the second day you brought her some pictures that had his picture—
“A. Yes, sir, I did.
“Q. —in it? You said she didn’t make a positive identification. Did she say anything about his picture?
“A. Yes, sir.
“Q. She said ‘He had similar characteristics and he looked like him.’ But it was not a positive identification for me to confirm that it was him.”
From our review of the entire testimony in the case, we are convinced that appellant’s second issue should be decided adversely to him. At this time, we should note also that Mr. Phillip Foster, although he was not an actual eyewitness to the robbery, was a witness as to the identity of the robber. He testified extensively as to his chasing the man who had left the automobile in which he testified the victim was riding. His testimony was in pertinent part as follows:
“Q. Now, Mr. Foster, you told the jury that you observed, both in the parking lot and during that five or six minutes that you chased the man, the assailant. Now, I would ask you whether or not you see that person in the courtroom today that you chased for that five or six minutes and that you saw in that parking lot on August the 1st, 1983?”
“A. I — I believe to the best of my ability, it had been several months, but I believe that the defendant is that individual.
“Q. In your best judgment is he the individual?
“A. In my best judgment, yes.”
III.
The caption in brief of counsel for appellant of the only other issue presented is as follows:
“WHETHER IT WAS REVERSIBLE ERROR FOR THE TRIAL JUDGE TO ADMIT INTO EVIDENCE KNOWN FINGERPRINT CARDS UNDER THE BUSINESS RECORD EXCEPTION TO HEARSAY OVER OBJECTION OF IMPROPER PREDICATE.”
Ms. Marietta Prevo, an employee with the Alabama Bureau of Investigation, Latent Fingerprint Unit, whose expertise in the field of fingerprint identification is not questioned, testified that on August 17, 1983, she received in the mail from Lt. Strunk “fourteen latent lifts” or latent fingerprints “on ten white cards” which she examined and compared with “the known prints of David Matthew Thomas.” She further testified that only three of the latent fingerprints “contained enough detail to be identified,” but the others did have such value to compare “with somebody’s known prints.” She testified:
“A. They were identified with the fingerprints on the fingerprint card which was submitted to me bearing the name of David Matthew Thomas.
“Q. All these fingerprints of value, the latent fingerprints of value, were fingerprints of David Matthew Thomas?
“A. Yes, sir.
“Q. There were no fingerprints of value of anybody else’s?
“A. No, sir.”
Near the conclusion of her testimony on direct examination, we find the following:
“Q. So in all three of these latent prints that you were telling the ladies and gentlemen of the jury are one and the same of the prints of David Matthew Thomas, there were in your judgment at least nine points of identification, if not more?
“A. Yes, sir.
“Q. All right. Could they be the fingerprints, to your knowledge, of any other human being in the world other than David Matthew Thomas?
“A. No, sir, they could not.
“MR. WILKINSON [assistant district attorney]: We would at this time, may it please the court, offer into evidence what has been marked as State’s Exhibit One for identification, in toto. And we would *846 offer into evidence State’s Exhibits Two-B and Two-A, the known fingerprint cards of the defendant David Matthew Thomas, that the witness has testified are identical.
“THE COURT: Do you want to be heard on that, Rick [Mr. Digiorgio]?
“MR. DIGIORGIO: We would object, Your Honor, improper predicate in regard to both items. Specifically as to State’s Exhibit Two. She has not stated she received State's Exhibit Two in the mail.
“Q. Did you get the known fingerprint cards of David Metthew Thomas in the mail?
“A. Yes, sir, I did.
“Q. And those are the ones that you compared with the latents that were the same; weren’t they?
“A. Yes, sir.
“MR. WILKINSON: Okay. We re-offer them.
“THE COURT: Let’s get through your cross first, Rick, and I will rule on the question.
“MR. DIGIORGIO: I renew my—
“THE COURT: I thought may be you might elicit some—
“MR. DIGIORGIO: I renew my objection to both items.
“THE COURT: All right. Let me defer until you cross-examine the lady.
“MR. DIGIORGIO: Yes, sir.”
The court reporter’s transcript contains a large amount of testimony as to the custody and control of the known fingerprints of defendant, State’s Exhibit Two, of which some is confusing and unclear. Nevertheless, we believe that the testimony of Deputy Sheriff Bernard Mays of “the Fingerprint Department of the Jefferson County Sheriff’s Department” is sufficient to afford a basis for a correct determination of the third issue presented by appellant. We quote from Officer Mays’ testimony as follows:
“Q. Is that [the Fingerprint Department] located upstairs in the courthouse here?
“A. Yes, sir, seventh floor.
“Q. Is it part of your duties, Mr. Mays, to maintain the fingerprint cards, known fingerprint cards, records of known fingerprint cards of people who are printed?
“A. Yes. Due to the large capacity we are asked to keep, we keep them at our main headquarters, which is located in Fairfield, Alabama.
“Q. But you would be a custodian of those records upstairs?
“A. Yes.
“Q. I am going to show you what has been marked as Defendant’s Exhibit Two for identification. Actually it is Two-A and Two-B. Would you look at those, please? All right, now Mr. Mays, are those records generally familiar to you?
“A. Yes, sir.
“Q. As fingerprint custodian, as custodian of fingerprint records?
“A. Yes, sir, they are.
“Q. In your judgment do they appear to be the known fingerprint cards of a David Matthew Thomas?
“A. That they do, yes, sir.
“MR. WILKINSON: Thank you. Answer his questions, if you would.
“CROSS-EXAMINATION
“BY MR. DIGIORGIO:
“Q. Do not other law enforcement agencies use similar type forms for taking fingerprints?
“A. As required by the FBI, they all use the same cards.
[[Image here]]
“Q. Are your initials on any of these cards?
“A. No. They can’t be initialed. We are not allowed to initial them.
“Q. Do you remember specifically ever seeing these cards with David Matthew Thomas’ name on them?
[[Image here]]
“A. No, I do not.
*847 “Q. Thank you. Are there any numbers on these cards indicating they are from the Jefferson County Sheriff’s Department?
“A. Yes, sir, there are.
“Q. Which numbers are they?
“A. ORI numbers located approximately on the upper right hand side of the fingerprint card.
[[Image here]]
“Q. You said these are also kept in Fair-field?
“A. Well, that is what we call our headquarters, yes, on Commerce Avenue.
“Q. And you are not assigned to the Fair-field Office, are you?
“A. No, I am not.
“Q. And you don’t know whether these cards came from the Fairfield Office or from upstairs; do you?
“A. Yes, sir, I do.
“Q. You do?
“A. These cards would not be kept there.
“Q. Would not be kept where?
“A. Upstairs only for one day and that is after they are checked by me. And that is where they are sent.
“Q. And then they are sent to Fairfield?
“A. Yes, sir.
“Q. So after that one day you don’t have custody or control over those cards any longer? They go to Fairfield; is that correct?
[[Image here]]
“Q. Is that a correct statement?
“A. That is correct.
“MR. DIGIORGIO: That is all the questions I have.
“REDIRECT EXAMINATION
“BY MR. WILKINSON:
“Q. On your shift you are the man that has the care, custody and control on all of them until they are shipped to Fairfield; aren’t you?
“A. That is correct.
“Q. The name that appears on the top of the card there is a name of somebody who took the prints. Is it a. familiar name to you?
“A. Yes, it is.
“Q. Who is it?
“A. Deputy Mark Lawley.
“Q. Do you know Deputy Lawley?
“A. Yes, sir.
“Q. Does he work upstairs in the Sheriff's Department?
“A. Yes, he does.
“MR. DIGIORGIO: One question, Your Honor.
“RECROSS EXAMINATION
“BY MR. DIGIORGIO:
“Q. Do you recall what days in August you were working?
“A. Yes, I do.
“Q. Would you have been working on August 14th?
“A. Yes, I would.
“Q. What is the date that these prints were taken? Can you tell from looking at them?
“A. Not the exact date that they were taken.
“Q. In fact, Officer, this signature next to Mark R. Lawley’s name, it says date and it says 8/83; isn’t that correct?
“A. That is correct.
[[Image here]]
“Q. From looking at this you cannot tell exactly what date Mr. Lawley, if in fact this is Mr. Lawley’s signature, signed that card?
[[Image here]]
“A. The suspect in question was present on 8/15. The 8/83 is only required by the State, they require us to put the month and year the individual was printed.
“Q. Regarding to date of 8/15, does it not say on here the date of arrest?
“A. Yes, it does.
*848 “Q. It doesn’t say that that was the day the prints were taken; does it?
“A. No, it does not.
“Q. So you cannot be sure that you were even working on the day these prints were taken; can you?
“A. Would you repeat that question? Can I not be sure I was working?
“Q. Yes. It would be a yes or no answer. I believe the question would be, can you or can you not be sure that you were working on the day these prints were even taken?
“A. No, I cannot.
“Q. And you will only have had those prints for one day, if you were working that day?
“MR. DIGIORGIO: That is all the questions I have.
“REDIRECT EXAMINATION
“BY MR. WILKINSON:
“Q. They are Jefferson County fingerprints. Do you know the man who took them; do you recognize his signature?
“A. Yes, I do.
[[Image here]]
“Q. I would ask you whether or not you know the gentleman who signed the fingerprint card?
“A. Mr. Lawley, yes, I do.
“Q. I will ask you whether or not those are the routine fingerprint cards taken by the Sheriff’s Department?
“A. Yes, they are.
“Q. Okay. I will ask you whether or not as a matter of routine people are fingerprinted on the day they are arrested?
“A. Yes.
“Q. I will ask you whether or not as a matter of routine those cards are given to you, kept under your care, custody and control and shipped to Fairfield?
“A. Yes.
“MR. WILKINSON: That is all.
“MR. DIGIORGIO: Your Honor, I have another question regarding—
“THE COURT: All right.
“RECROSS EXAMINATION
“BY MR. DIGIORGIO:
“Q. You did not see Mr. Lawley sign this card; did you?
“A. No, I did not.
“Q. So you don’t know, other than his signature, you don’t know for a fact that Mr. Lawley took those prints. You didn’t see him take them; did you?
“A. No, I did not see him take it.
“Q. And again, you do not remember seeing these cards, other than today, these particular cards?
“A. No, I do not.
“MR. DIGIORGIO: That is all I have.
“MR. WILKINSON: Thank you Mr. Mays. We appreciate it.
“THE COURT: Are you familiar with Law-ley’s signature?
“THE WITNESS: Yes, I am. We have signatures and also we have various characteristics that each individual is responsible for so that another individual can’t say, well, I didn’t do those, I don’t know those prints, somebody signed my name. We have—
“THE COURT: You have become familiar with his signature?
“THE WITNESS: Yes, sir.
“THE COURT: Is that his signature, in your judgment, on each of those exhibits?
“THE WITNESS: Yes, sir. And also the characteristics also.
“THE COURT: What do you mean by that?
“THE WITNESS: Well, there are three — I, of course, do most of the fingerprinting myself on my shift and other deputies are assigned to other shifts. And we have what we call the characteristics that we put on the cards so if anybody broke them and they are a bad set of prints and don’t want to take responsibility for them, they could *849 put somebody else’s name on them. What Mr. Lawley does, he types out the place of birth—
[[Image here]]
“THE WITNESS: Yes, sir. Well, they have characteristics, I myself, I know all of them because, again, running it and everything, and I am in charge of checking on the prints daily. As a matter of record approximately forty to fifty — I guess anywhere from seventy-five to a hundred cards I have to check every day.
“THE COURT: All right.
“THE WITNESS: So, what we do is each— where it says place of birth, Lawley uses Jeff. County, he is the only somebody that uses that. J-e-f-f., Co. Al. The evening shift uses J-e-f-f-e-r-s-o-n, Co., Al. As the night shift uses particularly — well, he was killed, unfortunately, the one — he used — he typed up Jefferson County and Alabama directly under that.
“THE COURT: All right. Does that prompt any questions Rick?
“MR. DIGIORGIO: Yes, sir, it does.
“THE COURT: All right.
“RECROSS-EXAMINATION
“BY MR. DIGIORGIO:
“Q. Would there only be one person on each shift to take fingerprints, available? “A. Yes, sir. On the day shift it is myself and on the night shift Mr. Lawley, now. And on the afternoon shift it’s Mrs. Frazier.
[[Image here]]
“Q. Day shift uses one code, night shift uses another code; not necessarily the person, but whoever is working that shift?
“A. No. I said the particular person. That was what I said, I said so they would correspond with the signature. Because, what I said takes place if an individual came in that was rolled and he might have goofed up on the prints or something wasn’t done right and I checked it, of course, I would have to do what is necessary to make sure things are right. So, what that individual might do to get the bee off of him is to sign somebody else’s name to a card.
“Q. Again, I ask you, you do not remember these particular cards?
“MR. WILKINSON: We object, this is the fourth time, may it please the Court, and we object strictly on repetition.
“THE COURT: You can answer one last time.
“THE WITNESS: No, I do not.
“MR. DIGIORGIO: That is all.
“MR. WILKINSON: Thank you, we appreciate it very much.
“THE COURT: Thank you so much.
“MR. WILKINSON: For the record, may it please the Court, we would offer State’s Exhibit No. Two for identification into evidence.
“MR. DIGIORGIO: Your Honor, for the record we object and state grounds of aut-hencity of the actual signature or cards themselves. And also object on the ground that theré is no exception to the hearsay rule that has been complied with. I believe there is an attempt to be made to admit them as business records, that this individual cannot even remember whether those particular records were kept in his custody at any particular time. And I don’t believe that would qualify under the business ac-ception [sic] rule.
“THE COURT: All right. Overruled.
“MR. DIGIORGIO: We would except.
“(Whereupon, said exhibit having previously been marked for identification as State’s Exhibit No. Two was received in evidence. This exhibit has been delivered to the Office of the Clerk of the Court in accordance with the Rule of Appellate Procedure adopted June 17, 1975.)
“MR. WILKINSON: The State rests.”
• We do not agree with the position taken by appellant as to the final issue. On the contrary, we agree with the following statement in the brief of counsel for appellee:
*850 “Appellant contends the fingerprint cards of Appellant were inadmissible because there was no testimony from the person who actually took them. This is in essence a chain of custody issue and the State submits that the failure of the man who actually took the prints to testify does not constitute a break in the chain of custody.
“The purpose of establishing a chain of custody is to show to a reasonable probability that there was no tampering with the evidence. Congo v. State, 409 So.2d 475 (Ala.Crim.App.) cert. denied, 412 So.2d 276 (Ala.1981). It must be shown to a reasonable probability that the object is the same as, and not substantially different from the object that existed at the commencement of the chain. Sexton v. State, 346 So.2d 1177 (Ala.Crim.App.), cert. denied, 346 So.2d 1180 (Ala.1977).”
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur, except BOWEN, P.J., who concurs in result only.